LICHNOVSKY v ZIEBART INTERNATIONAL CORPORATION

Docket No. 78-2796. Submitted June 7, 1979, at Lansing.—Decided October 15, 1979. Leave to appeal applied for.

Anthony S. Lichnovsky entered into a "license agreement" with Auto Body Rustproofing Company granting him the exclusive right to establish and operate "Auto Body Rustproofing" stations using the Ziebart compounds, equipment and name within Genesee County. The contract stated in part, "[t]his license agreement shall be in full force and effect indefinitely, unless terminated by an earlier date in accordance with the provisions of Paragraph 11". Paragraph 11 outlined the procedure for termination for default. As part of the agreement Lichnovsky agreed "to strictly adhere to the methods, practices and system established and in effect by Licensor for the management and operation of [the business]". Ziebart Rustproofing Co., Auto Body Rustproofing's successor in interest, in 1973, informed Lichnovsky that their agreement allowed termination by either party upon reasonable notice and offered Lichnovsky a new ten-year contract, but Lichnovsky refused. Later, Ziebart published policies and instruction manuals delineating the rustproofing procedures it deemed necessary for various vehicle models. The policies required the attaining of certain grades on examination by company inspectors in order to maintain a dealer's "good standing". Lichnovsky failed to make the required grades and a dispute over failure to meet required standards, failure to keep current instruction manuals and failure to treat certain portions of the vehicles culminated in a letter from Ziebart to Lichnovsky announcing its intention to terminate the agreement and gave Lichnovsky 30 days to either sell or remove all Ziebart identification from his premises. Lichnovsky filed suit in the Genesee Circuit Court against Ziebart International Corporation and Ziebart Rustproofing Company seeking an injunction. Defendants counterclaimed, admitting the agree-

REFERENCES FOR POINTS IN HEADNOTES

[1] 17 Am Jur 2d, Contracts §§ 275, 276.
[2-4] 17 Am Jur 2d, Contracts § 486.
Termination by principal of distributorship contract containing no express provision for termination. 19 ALR3d 196.

ment and asserting that defendants had improved the Ziebart process, that plaintiff failed to adopt the new procedures, that his noncompliance injured the Ziebart trademark and that they had a right and a duty to ensure standardization. They sought a declaration of termination, an injunction prohibiting plaintiff from using the trademark and damages. The court, Ollie B. Bivins, J., ruled that the agreement controlled the rights of the parties and that the requirements plaintiff was charged with ignoring did not contribute to effective rustproofing and enjoined defendants from interfering with plaintiff's business. Defendants appeal. *Held:*

1. A contract provision that the agreement "shall be in full force and effect indefinitely, unless terminated at an earlier date in accordance with [other provisions]" does not compel an interpretation that the parties intended perpetual duration and, in fact, contributes nothing to the task of determining the duration intended by the parties.

2. The "Missouri Rule" that a principal's otherwise unfettered right to terminate at will an agreement specifying no duration period is limited by the agent's right to enforce the agreement for such time as will afford him a reasonable opportunity to recoup the expenses he incurred in preparing to perform his obligations applies to license or franchise agreements providing for territorially exclusive distribution where the distributor must purchase the product that is the subject of the agreement, promote the sale of the product and make agreements intended to bind the manufacturer; in such agreements the distributor becomes the business agent of the manufacturer-principal and the limitation on the principal's power to terminate applies only when the agent has actually and forseeably expended capital or given up an otherwise profitable business in his preparations and allows recoupment only of those expenditures directed to this end.

Remanded for further proceedings.

V. J. BRENNAN, J., concurred in the reasoning of the majority but would grant plaintiff an opportunity to rectify the problems precipitating defendant's decision to terminate and the option to sell the franchise to a third person under the condition that defendant's current operating procedures be met.

OPINION OF THE COURT

1. CONTRACTS — CONSTRUCTION OF CONTRACTS — AMBIGUITY.

Any ambiguity in a contract should be construed against the party who drafted it.

2. Contracts — Duration — Indefinite Duration.

A contract provision that the agreement "shall be in full force and effect indefinitely, unless terminated at an earlier date in accordance with [other provisions]" does not compel an interpretation that the parties intended perpetual duration and, in fact, contributes nothing to the task of determining the duration intended by the parties.

3. Contracts — Exclusive Distribution Contracts — Termination — Missouri Rule — Principal and Agent.

The "Missouri Rule" that a principal's otherwise unfettered right to terminate at will an agreement specifying no duration period is limited by the agent's right to enforce the agreement for such time as will afford him a reasonable opportunity to recoup the expenses he incurred in preparing to perform his obligations applies to license or franchise agreements providing for territorially exclusive distribution where the distributor must purchase the product that is the subject of the agreement, promote the sale of the product and make agreements intended to bind the manufacturer; in such agreements the distributor becomes the business agent of the manufacturer-principal and the limitation on the principal's power to terminate applies only when the agent has actually and forseeably expended capital or given up an otherwise profitable business in his preparations and allows recoupment only of those expenditures directed to this end.

CONCURRENCE BY V. J. BRENNAN, J.

4. Contracts — Principal and Agent — Termination — Missouri Rule.

*An agent in an agency relationship subject to the "Missouri Rule" who is having his relationship terminated by the principal for failure to meet the principal's current operating procedures should be afforded an opportunity to rectify the problems or sell the business to a third party under the condition that the principal's current operating procedures be met.*

*William J. Priehs,* for plaintiff.

*Goodenough, Smith & May* (by *Richard H. May* and *Robert A. Vieweg) (Burton, Parker & Schramm,* of counsel), for defendants.

Before: DANHOF, C.J., and V. J. BRENNAN and
H. R. CARROLL,* JJ.

DANHOF, C.J. In 1963 the plaintiff was ap-
proached by representatives of Auto Body Rust-
proofing, Inc., who offered him a franchise to sell
and apply the then recently developed "Ziebart
process" for rustproofing automobiles. Negotiations
between the parties produced a "license agree-
ment", composed by the defendant and signed by
the parties on June 13, 1963.[1]

The agreement granted the plaintiff the exclu-
sive right to operate an "Auto Body Rustproofing"
station in Genesee County, including the right to
use "Ziebart Compounds" and the tools and proc-
esses developed by the defendant for their applica-
tion. The plaintiff was entitled by the agreement
to purchase all the Ziebart compounds his business
required at the price prevailing at the time of
order. For a charge of $6,000 the plaintiff was to
"purchase" a quantity of consumable supplies,
including Ziebart compound and various special-
ized application tools and other equipment; title to
the tools and equipment was to remain with the
defendant. Worn or damaged tools and equipment
were to be replaced by the plaintiff at the "price"
prevailing at the time of "purchase".

The defendant agreed to provide a 12-day train-
ing session for two persons at its Detroit facility,
travel and accommodation expenses to be paid by
the plaintiff.

Among the other terms of the agreement were
the following:

---

* Former circuit judge, sitting on the Court of Appeals by assign-
ment pursuant to Const 1963, art 6, § 23 as amended in 1968.

[1] The defendants in this action are successors of Auto Body Rust-
proofing, Inc. In this opinion, "defendant" will designate the named
defendants or their predecessors, unless otherwise indicated.

"7. It is understood and agreed that a material part of the consideration passing to the Licensor hereunder is the promise and agreement of Licensee to strictly adhere to the methods, practices and system established and in effect by Licensor for the management and operation of AUTO BODY RUSTPROOFING stations in order to retain and protect for the mutual benefit of Licensor and Licensee and the good will and public acceptance of AUTO BODY RUSTPROOFING, and in pursuance thereof Licensee specifically promises and agrees as follows:

"(a) To use only the "Ziebart Compounds" and "Ziebart Solvents" in the operation of their business.

"(b) To charge a minimum of $35.00 per vehicle for each AUTO BODY RUSTPROOFING process.

"(c) To use only the mobile equipment, nozzles and method of operation furnished by Licensor in performing an AUTO BODY RUSTPROOFING treatment to a vehicle, and not to use such said equipment or any part thereof in connection with the performing of any other process and the use of any other solvents and compounds other than that furnished and sold by Licensor to Licensee.

\* \* \*

"(g) To operate said business only under the name of AUTO BODY RUSTPROOFING, and to exhibit only such advertising signs as shall be approved by Licensor.

"(h) To pay any and all obligations incurred by him in said business when the same become due and payable.

"(i) To follow strictly the AUTO BODY RUSTPROOFING process; to maintain the standard established by Licensor; not to cheapen said process.

"8. Licensee shall pay for his own building, plumbing, electrical equipment and lighting, carpenter work and material, of every kind that may be necessary to establish and place in operation the AUTO BODY RUSTPROOFING Store or Station which may be established hereunder, and Licensor shall not be obligated nor liable for any sum or sums incurred by Licensee for such labor or materials.

\* \* \*

"10 This License Agreement shall be in full force and effect indefinitely, unless terminated at an earlier date in accordance with the provisions of Paragraph 11.

"11. Should Licensee fail to perform any of the terms, conditions or provisions of this License Agreement, and shall remain in default for a period of 30 days after the receipt of a notice by Licensor by registered letter setting forth the reasons and grounds for default, Licensor shall thereafter have the right to terminate this Agreement forthwith by registered letter to Licensee; to repossess with or without legal process any and all equipment delivered to Licensee by Licensor under the terms of this Agreement; to retain all money paid for the use of said equipment; to terminate all of the rights and privileges herewith granted, and to enter into any License Agreement or contract granting to any other person the right to operate an AUTO BODY RUST-PROOFING business in the territory described in this Agreement; to remove with or without legal process any and all signs bearing or displaying the trade mark or trade name "AUTO BODY RUSTPROOFING"; to take possession of any and all supplies which bear the AUTO BODY RUSTPROOFING trade mark or trade name, upon reimbursement of the cost of said supplies only to Licensee; and to resort to any other legal process for the enforcement of this Agreement. If legal action by Licensor is necessary to enforce the performance of this Agreement by Licensee, Licensee agrees to pay Licensor such sum as the Court may fix as reasonable attorney's fees.

*    *    *

"14. Licensee agrees that if for any reason whatsoever, the license is terminated, Licensee will not solicit or engage directly or indirectly in a business similar to that of AUTO BODY RUSTPROOFING for a period of Two (2) years in the United States or Canada, except as is hereinafter provided."

The relations between the parties were apparently satisfactory for several years. In 1973 the defendant informed the plaintiff that the 1963

agreement permitted termination upon reasonable notice by either party and offered the plaintiff a new ten-year contract, which the plaintiff refused. Sometime thereafter the defendant published policies and instruction manuals delineating the rustproofing procedures it deemed necessary for various models of motor vehicles. The policies variously required "grades" of 85 or 90 percent on vehicle inspections by company officials as a condition of a dealer's "good standing". The plaintiff's work consistently failed to meet these requirements, the company inspectors complaining of his cluttered shop, his failure to keep current instruction manuals and his failure to treat certain portions of automobile bodies with the Ziebart compound. The dispute culminated in a letter to the plaintiff from the defendant, dated April 6, 1976, in which the defendant reiterated its complaints, announced its intent to terminate the "license agreement" and gave the plaintiff 30 days to either sell his "license" or remove all Ziebart identification from his building.

The plaintiff commenced this action in circuit court before the 30-day period elapsed, alleging that the defendant had "long coveted your Plaintiff's exclusive rights in Genesee County" and had "embarked upon a program of harassment and intimidation designed to force your Plaintiff from his business". The plaintiff claimed that the standards of performance demanded by the defendant were not contained in the 1963 agreement and could therefore not support the threatened termination. The complaint sought an injunction against the defendant's "wrongfully interfering" with the plaintiff's business or obstructing his right to purchase supplies and use the Ziebart trademark.

The defendant answered with denials, but, curiously, did not claim that the performance standards in question arose from the 1963 agreement, stating merely that they were "necessary to protect the public, as well as the good name and reputation of the defendant". A counterclaim admitted that the 1963 agreement permitted the plaintiff to use the Ziebart mark but asserted that defendant had developed and improved the Ziebart process, that the plaintiff had failed to adopt the new procedures, that his noncompliance injured the value of the Ziebart mark and that the defendant had a right and a duty (apparently to other retail dealers) to ensure the standardization of the process. The defendant sought a declaration that the parties' contract was at an end, an order prohibiting the plaintiff from using the trademark and damages.

At trial, the central issue was the utility of the defendant's new standards in increasing or ensuring the quality of automobile rustproofing. The plaintiff stated that in his many years in the automobile body repair business he had never seen rust in the areas he had refused to treat, an observation which was confirmed by other individuals engaged in that business. It also appeared that the plaintiff consumed in his business more of the compound purchased from the defendant than called for by company standards. There was testimony from the plaintiff that in 1963 the defendant's training for dealers was "general" and not nearly as exacting as the procedures set forth in the new instruction manuals. The plaintiff stated that he had refused the defendant's 1973 offer of a ten-year contract because the new offer substantially restricted his right to move his business within Genesee County or to sell it to a new

licensee and additionally subjected him to compulsory promotional assessments by the defendant.

While concluding that the 1963 agreement controlled the rights of the parties, the trial judge also found that the requirements the plaintiff was charged with ignoring did not contribute to effective rustproofing. An order issued, restraining the defendant from terminating the agreement and from "harassing or obstructing or interfering in any way with the conduct of the [plaintiff's] business". This appeal followed.

The defendant's primary claim on appeal is that the trial court erred in its determination that the plaintiff did not breach his agreement with the defendant to maintain certain quality standards in marketing the Ziebart process. The standards of performance required of the plaintiff must necessarily be determined by reference to the parties' 1963 agreement. However, that instrument does not specify the details of the procedure the plaintiff agreed to follow, stating merely that the plaintiff must "strictly adhere to the methods, practices and system established and in effect by Licensor for the management and operation of AUTO BODY RUSTPROOFING stations" and "follow strictly the AUTO BODY RUSTPROOFING process; to maintain the standard established by Licensor; not to cheapen said process". These phrases do not tell us whether the performance of the plaintiff is to be measured by the "methods, practices and system" in effect in 1963, when the plaintiff was solicited to enter the contract, or by standards the defendant would later develop in the expansion and standardization of its system of franchised outlets. Neither view is unreasonable, for, while we are accustomed to viewing contracts as inflexible constitutions of the business world, we

also note that the defendant's process was new in 1963 and could be expected to be refined as experience revealed opportunities for improvement.

The possibility of changing economic and technical conditions was contemplated by the defendant when it drafted the agreement. The defendant retained rights to change the chemical makeup of its compound, to charge the current market price for compounds and tools delivered to the plaintiff in the future and to regulate the content of the plaintiff's advertising. This conscious effort to provide for technical changes and business supervision must be contrasted with the defendant's failure to explicitly retain similar powers with respect to the application of the compound by the plaintiff, and yields no inference that the defendant ever intended to have the power it attempted to exercise in this relationship. Such a significant power should not easily be discovered in a contract not explicitly providing for it.

If the contested contractual terms are viewed in isolation, they are at best ambiguous and call for the construction most favorable to the plaintiff, who was not responsible for the drafting of the instrument. See *Ladd v Teichman,* 359 Mich 587; 103 NW2d 338 (1960). The trial judge was correct in limiting the defendant's right to enforce performance standards to those standards contemplated by the agreement. While the matter was apparently decided below on the grounds that the defendant's post-1963 requirements were not shown to be reasonably related to effective rustproofing, we affirm the decision upon our observation that the defendant never attempted to prove what body coverage and shop upkeep standards were ordinarily observed by the defendant and its dealers in 1963. It may be assumed that this proof

was in the possession of the defendant. Without it, no breach of the contract in this regard can be shown.

A determination that the plaintiff has not breached the performance standards of the 1963 agreement does not end our examination of this troubled relationship. The defendant argues on appeal that the contract, being for an "indefinite" duration, was terminable at will. The plaintiff, seeking relief on the grounds that the parties' obligations were to endure as long as he was not in breach of the agreement, necessarily claimed that its "indefinite" duration term created perpetual rights in both parties. The trial court never directly considered the question, but, in passing upon the defendant's claim to a right to terminate the agreement due to the plaintiff's breach, impliedly adopted the plaintiff's position. For the reasons set forth below, we are unable to agree that either party's view is correct.

The plaintiff's claim to a perpetual right to operate his franchise and to demand performance of the defendant asks this Court to find in the sparse language of this agreement an undertaking very seldom encountered in the commercial world —a promise of two business entities to remain bound to each other as long as both (including their heirs, executors, administrators, successors or assigns) remain in existence and meet the requirements of the contract. Such obligations are so inaptly fitted to the always changing commercial world that courts find them only when the language of an agreement allows no other reasonable construction.

"It is not often that a promise will properly be interpreted as calling for perpetual performance. Only in such negative promises as to forbear suit or not to

carry on a business or occupation is so broad an interpretation likely to be permissible. More commonly the true interpretation will mean some period short of infinity; and partly in order to carry out the supposed actual intention of the parties and partly, doubtless, in order to prevent an offer or agreement from being ineffectual because too indefinite, courts will, where the contract contemplates a single act or exchange of acts, unless the circumstances show a contrary intention, interpret a promise which does not in terms state the time of performance as intending performance in a reasonable time." (Footnotes omitted.) 1 Williston on Contracts (3d ed), § 38, p 113.

See also *Adkisson v Ozment,* 55 Ill App 3d 108; 12 Ill Dec 790; 370 NE2d 594 (1977), *Paisley v Lucas,* 346 Mo 827; 143 SW2d 262 (1940), *Holt v St Louis Union Trust Co,* 52 F2d 1068 (CA 4, 1931).

There is nothing in the terms of this agreement that indicates a perpetual duration was not intended by the parties; however, the term "indefinitely" hardly compels such a construction, for it means merely, "having no exact limits". In the absence of a more forceful indication of intent a construction favoring a perpetual relationship is not warranted. We conclude that the term contributes nothing to our task of determining the duration intended by the parties.[2]

The defendant contends that an agreement for an unspecified or indefinite term may be cancelled at the will of either party. This is generally true of contracts establishing agency or employment relationships. *O'Connor v Hayes Body Corp,* 258 Mich 280; 242 NW 233 (1932). Yet, it is clear that more than an employment was contemplated by the parties to this agreement.

---

[2] We are unable to discern *any* meaningful expression of intent from the fact that the duration of the undertaking was explicitly stated to be indefinite rather than being omitted altogether.

The "license" or franchise agreement at issue in this case is remarkably similar to contracts which create territorially exclusive distributorships. Such agreements bear many of the characteristics of contracts for continuing sales in that the distributor must often purchase the product that is the subject of the agreement; yet, they often require the distributor to promote the sale of the product and make agreements intended to bind the manufacturer, and in this respect make the distributor the business agent of the manufacturer "principal". See *Hunt Foods, Inc v Phillips,* 248 F2d 23 (CA 9, 1957).

Several courts, viewing distributorships in light of their agency characteristics, have applied the so-called "Missouri Rule" and held that in agreements for an unspecified duration the principal's otherwise unfettered right to terminate the arrangement at will is limited by the agent's right to enforce the agreement for such a time as will afford him a reasonable opportunity to recoup the expenses he has incurred in preparing to perform his obligations. See, *e.g., Jack's Cookie Co v Brooks,* 227 F2d 935 (CA 4, 1955), *Beebe v Columbia Axle Co,* 233 Mo App 212; 117 SW2d 624 (1938). See also, 9 Williston on Contracts (3d ed), § 1017A, p 152, Gelhorn, *Limitation on Contract Termination Rights—Franchise Cancellations,* 1967 Duke LJ 465, 482, Anno: *Termination by Principal of Distributorship Contract Containing No Express Provision for Termination,* 19 ALR3d 196. This limitation on the principal's power applies only when the agent has actually and foreseeably expended capital or given up an otherwise profitable business in his preparations, and allows recoupment only of those expenditures directed to this end; it does not include ordinary operating

expenses and does not guarantee the franchisee a profit.

"Where the duration of a distributor contract is indefinite and distributor has expended substantial sums in establishing and promoting the distributorship and such expenditures were within the contemplation of the parties, the contract may be terminated after the lapse of a reasonable time. What a reasonable time is depends upon the circumstances in the particular case. Among the circumstances to be considered in determining reasonable time are: The amount of preliminary and promotional expenditures, the length of time the distributorship has been in operation before notice of termination, what the prospects for future profits are, and whether it has proven profitable during actual operation. It is not a question of whether distributor has recouped his expenditures, but whether he has had a fair opportunity." *The General Tire & Rubber Co v Distributors, Inc,* 253 NC 459, 472; 117 SE2d 479 (1960).

While the disputes most frequently presented to the courts have involved sudden terminations shortly after the distributor or franchisee has made his investment, see Gelhorn, *supra,* there appears in principle no reason why continuing investments not part of the agent's operating costs or directed solely at improving his own business and fairly foreseeable to the principal should not come within this rule. This was recognized in the allowance of a claim for recoupment of unamortized capital expenditures not part of the distributor's start-up investment in *Ag-Chem Equipment Co, Inc v Hahn, Inc,* 480 F2d 482 (CA 8, 1973). The rule simply prevents a manufacturer or franchisor from exercising a power to terminate an agreement at will in such a fashion as to unfairly deprive the distributor or franchisee of assets foreseeably committed to their joint project.

The record shows that the plaintiff was required to make substantial expenditures in readying himself to perform his contract with the defendant.[3] However, it is impossible to determine from this record the amount of the expenditures that the plaintiff has made or whether, despite the long period which has elapsed since the performance started, the plaintiff's "reasonable time" has passed. Despite the failure of the parties to pursue this matter in the court below, proper resolution of this dispute requires that an evidentiary hearing in the trial court address this matter. The trial court will determine what time was or will be required to protect the plaintiff's right to recoupment. If that time has passed, the choice to terminate the agreement lies with the defendant. If the plaintiff has not yet enjoyed a reasonable period of performance in which to recoup his expenditures, the trial court will order the defendant to afford the plaintiff such a proper period, specifying the duties of the defendant to the plaintiff in an order conforming with GCR 1963, 718.9(2).

The cause is remanded to the trial court for proceedings not inconsistent with this opinion. No costs, neither party having prevailed in full.

H. R. CARROLL, J., concurred.

V. J. BRENNAN, J., *(concurring).* I concur in Judge DANHOF's opinion. While I agree that the "Missouri rule" should be employed in determin-

---

[3] These included the purchase of specialized tools and the training of the plaintiff and one of his employees at the defendant's Detroit facility. It is not clear whether the plaintiff gave up his auto body repair business prior to starting performance, nor is it clear that such a sacrifice, if made, was required or reasonably anticipated by the defendant. A free choice to abandon a less lucrative business for an increasingly attractive one does not support a right of recoupment.

ing the extent of defendant's right to terminate, I would give to plaintiff the opportunity to rectify those problems which precipitated defendant's decision to terminate the contract, which would in effect allow plaintiff to maintain the business under the new policies of defendant. In addition, plaintiff should be given the option to sell the franchise to a third party under the condition that defendant's current operating procedures be met.