CLOVERDALE EQUIPMENT COMPA-
NY, Plaintiff–Appellant,

v.

SIMON AERIALS, INC.,
Defendant–Appellee.

No. 87–2195.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 12, 1988.

Decided March 10, 1989.

Michael H. Whiting (argued), Thomas H. Finnerty, Troy, Mich., for plaintiff-appellant.

Gregory G. Wille (argued), Milwaukee, Wis., I. Mark Steckloff, Detroit, Mich., for defendant-appellee.

Before MERRITT and RYAN, Circuit Judges; and POTTER, District Judge.[*]

RYAN, Circuit Judge.

Cloverdale Equipment Company, a Michigan corporation, sued Simon Aerials, Inc., a Wisconsin corporation, in diversity, presenting contract and fraud claims that sought damages resulting from the termination of a sales distributorship agreement. The district court granted summary judgment in favor of the defendant on all counts; plaintiff appealed. Because a careful review of the evidence presented to the district court indicates that the motion was properly granted, we affirm.

## I.

Cloverdale Equipment Company ("Cloverdale") sells and leases construction and other heavy equipment. Simon Aerials, Inc., ("SAI") manufactures aerial lift equipment used in the construction industry. In a series of meetings commencing in December of 1985, SAI's president, Mr. Terry Smith, and Cloverdale's president, Mr. Tom Moilanen, discussed the possibility of Cloverdale replacing SAI's present Michigan distributor of aerial lift equipment. Cloverdale was not, however, SAI's first choice. SAI had discussed with another Michigan company, Caledonia Tractor and Equipment Company ("Caledonia") the possibility of entering into a master distributorship agreement whereby Caledonia would control distribution for an entire region of the United States. But Caledonia was committed to its aerial lift supplier through 1986. Thus, Caledonia was unable to make any commitments and its discussions with SAI terminated in late 1985.

In January 1986, Smith and Moilanen agreed in principle to a distributorship arrangement by which Cloverdale would become an SAI distributor and purchase ap-

---

* The Honorable John W. Potter, United States District Judge for the Northern District of Ohio, sitting by designation.

proximately one million dollars of SAI equipment for sale or lease in Michigan. On February 15, 1986, SAI signed its standard distribution agreement contract and forwarded it to Cloverdale for approval. The standard contract designated Cloverdale as a distributor and permitted Cloverdale to purchase SAI products at discount for subsequent sale, lease, or service anywhere in the United States but with primary responsibility in lower Michigan. Thus, paragraph 1(b) of the standard contract provided:

> It is expressly understood that this is not an exclusive agreement and SAI reserves the right to appoint other Distributors who may sell, lease and service SAI Products in the Territory. The Distributor is in no way restricted from selling SAI Products outside the Territory, and SAI does not restrict itself or other Distributors from selling SAI Products inside the territory.

Recognizing the advantage of reduced competition from other SAI distributors, Cloverdale requested a modification of the standard contract's paragraph on exclusivity. Cloverdale signed the form contract subject to SAI's acceptance of the following letter:

Attn: Mr. Terry Smith, President
Gentlemen:

This letter will serve as an addendum to the Simon Aerials, Inc. Distributorship Agreement. The following items shall be revised:

> Page 1, "Witnesseth" Paragraph II, strike out the word "Non–Exclusive" and insert "Exclusive."
>
> Page 1, Paragraph 1b, Delete and replace with the wording "During the term of this agreement and so long as Distributor is in compliance with its obligations hereunder, SAI will not appoint another distributor, dealer, agent or consignee in, or for, the territory, nor will SAI sell on a direct basis in the territory except replacement parts to Cyril J. Burke, Inc. for a period not to exceed twelve months from the distributorship agreement with Cloverdale Equipment Co."

> Page 2, Paragraph 2C, Delete the words in the last sentence "and file, at its own expense and".
>
> Page 4, Paragraph # 9, Delete the last sentence in its entirety.
>
> Exhibit A—Add the words "-All" after the words Eagle Series.

Please sign and return one executed copy for our files.

Very truly yours,

CLOVERDALE EQUIPMENT COMPANY

SAI agreed to the proposed changes which effectively replaced SAI's standard paragraph 1(b) referring to nonexclusivity.

Significantly, Cloverdale did not request any change in the *termination* rights provision of the contract. Those rights are set out clearly in paragraph 11 on the fourth page of the six-page contract. Paragraph 11(a) states:

> 11. *Termination.* (a) This agreement may be terminated at any time by either party hereto upon sixty (60) days' written notice of such termination to the other party.

In addition, paragraph 11(b) provides that certain "occurrence[s]" would automatically terminate the relationship without the sixty-day notification unless SAI subsequently consented, in writing, to the occurrences. Those occurrences include Cloverdale's filing for bankruptcy, failing to pay or otherwise breaching the contract, failing to act in good faith in dealing with SAI, or Cloverdale's attempting to assign its distributorship rights.

In August 1986, Caledonia resumed discussions with SAI over the previously discussed possibility of a master distributorship and by mid-October the parties agreed to such an arrangement. Because the agreement, scheduled to take effect in 1987, included distribution rights in lower Michigan, SAI sent Cloverdale a written notice of termination pursuant to paragraph 11(a) of their contract on November 3, 1986. Cloverdale received the notice on November 5, 1986, and its distributorship was terminated sixty days later.

Cloverdale filed a complaint seeking recovery on four theories, one of which it

abandoned prior to this appeal. On appeal Cloverdale challenges the propriety of the district court's summary judgment dismissal of its contract, estoppel, and fraud claims.

## II.

Federal Rule of Civil Procedure 56(e) requires that the non-moving party confronted with a properly supported Motion for Summary Judgment "set forth specific facts showing that there is a genuine issue for trial." Otherwise, a district court may properly enter judgment before trial. Recent Supreme Court decisions have clarified the standards a court must apply when confronted with a Motion for Summary Judgment. In *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Court stated that summary judgment should not be disfavored and may be an appropriate avenue for the "just, speedy and inexpensive determination" of a matter. *Id.* at 327, 106 S.Ct. at 2555. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Court stated:

> If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's positions will be insufficient; there must be evidence of which the jury could reasonably find for the plaintiff.

*Id.*, at 252, 106 S.Ct. at 2512.

Clearly, mere allegations of a cause of action may no longer suffice to get a plaintiff's case to the jury. When confronted with a properly supported Motion for Summary Judgment, the party with the burden of proof at trial is obligated to provide concrete evidence supporting its claims and establishing the existence of a genuine issue of fact. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552; *Anderson*, 477 U.S. at 256,

106 S.Ct. at 2514; *Adcock v. Firestone Tire and Rubber Co.*, 822 F.2d 623, 626 (6th Cir.1987). On this appeal we must determine whether the district court was correct in concluding that Cloverdale presented insufficient evidence to rebut SAI's showing that it had properly terminated Cloverdale's distributorship pursuant to paragraph 11(a) of the parties' written contract.

## III.

In the first count of its amended complaint, Cloverdale alleged that when SAI terminated the distributorship it breached a contract for "an indefinite term [providing] for termination upon good cause only ..." On appeal Cloverdale advances four arguments for its proposition that despite paragraph 11(a)'s express language indicating that the parties had assented to a contract terminable at will, they were actually bound by a contract terminable only for cause.

■ First, Cloverdale argues that the letter addendum it drafted, referring to "Page 1, Paragraph 1b," expressly changed the contract's termination provisions or at least made the issue ambiguous because the addendum applied "so long as Distributor is in compliance with its obligations hereunder." But the addendum specifically referred to paragraph 1b of the agreement and made no reference to paragraph 11's termination provisions. The addendum expressly limits SAI from dealing with others in Cloverdale's market during the term of its contract with Cloverdale, but does not prevent SAI from exercising its paragraph 11(a) right to terminate its agreement with Cloverdale upon proper notice in order to engage another distributor.

■ Second, Cloverdale asserts that even if the addendum does not explicitly modify the paragraph 11 termination provisions of the contract, or at least render them ambiguous, the provisions themselves are so ambiguously drafted as to warrant the admission of parol evidence to prove that the parties intended that the contract could only be terminated for just cause.

Cloverdale's argument in this respect is that paragraph 11 is ambiguous because subparagraph (a) provides for termination without regard to cause, and subparagraph (b) provides for termination upon any one of seven occurrences. We are satisfied, however, that these paragraphs, read together, are not ambiguous. Rather, the contract clearly provides SAI with two independent bases for termination: (1) sixty days written notice by either party, and (2) automatic termination within ten days of SAI's learning of any one of seven occurrences constituting default by Cloverdale. The two provisions are clearly differentiated in separate subparagraphs—only 11(a) applies to the facts of this case.

Third, Cloverdale cites *J.R. Watkins Co. v. Rich*, 254 Mich. 82, 235 N.W. 845 (1931), for the proposition that even if the parties are bound by a contract terminable at will, Michigan law limits SAI to the good faith exercise of that express right.

*Watkins* also involved a sales distributorship, but the issue there was whether sureties were bound by their signatures to a contract. In *Watkins*, the J.R. Watkins Company sold its merchandise through salesmen who were permitted to buy goods on credit and solicit sales in an allotted territory. Walter E. Rich was a Watkins salesman who had operated under this credit agreement continuously since 1924, and had become indebted to the company for $715.30. On December 21, 1927, the company sent Rich a new contract, requiring not only his signature, but the signatures of sureties who would agree to pay Rich's old debts and all unpaid future charges at the time, place, and manner provided in the contract. "The contract provided that payment of the old debt should be from time to time during its term in amounts satisfactory to plaintiff, and that future charges should be paid on expiration or termination of the agreement. The practice was to make periodical or occasional payments." 254 Mich. at 83, 235 N.W. 845.

After Rich had obtained what the company deemed to be a sufficient number of sureties, the parties finally executed the contract in May 1928. One month later the company terminated the contract and demanded payment of all debts incurred by Rich as principal and Irving H. Brown and others as sureties. The termination provision of the contract provided: "And it is further mutually agreed that either of the parties hereto may terminate this agreement at any time by giving the other party notice thereof in writing by mail, and any indebtedness then owing by either party to the other shall thereupon be and become immediately due and payable." *Id.* at 84, 235 N.W. 845. The Michigan Supreme Court, affirming the trial court judgment, found "that the purpose of the sureties in their undertaking was to aid Rich to obtain the business for a new full term in which to pay his debts; that they would not have executed it if they had known such opportunity would be arbitrarily refused him ..." and that "testimony strongly indicated that plaintiff was [only] concerned with securing the execution of a contract to pay the old debt by sufficient sureties...." *Id.* at 84, 85, 235 N.W. 845. The Michigan Supreme Court discharged the sureties from contractual liability for Rich's debts because it found that the company had "arbitrarily and illegally terminated and breached the contract...." *Id.* at 85, 235 N.W. 845.

Later decisions have indicated that the basis behind the *Watkins* decision was the lack of good faith on the part of the company at the time it entered into the suretyship contract. Accordingly, the courts have limited the good faith rule announced in *Watkins* to situations where one of the parties lacked good faith at the time he or she bargained for the termination right. If properly bargained for, the right is given full effect and may be exercised for any reason. *Busam Motor Sales v. Ford Motor Co.*, 203 F.2d 469 (6th Cir.1953); *Bushwick–Decatur Motors v. Ford Motor Co.*, 116 F.2d 675 (2d Cir.1940). Cloverdale presented the court with SAI internal memos indicating that SAI had also discussed with Caledonia the possibility of a distributorship. But we find in these memos no evidence that could lead a reasonable jury to conclude that SAI sub-

mitted its standard form contract to Cloverdale in bad faith. There is no evidence that SAI planned to substitute Caledonia for Cloverdale when SAI contracted with Cloverdale in early 1986, and there is no evidence that SAI took active steps to cause Caledonia to quit its former distributor. SAI may have hoped that Caledonia would return for discussions, but liability for bad faith does not attach based upon one's hopes.

■ Finally, Cloverdale argues that representations made by SAI subsequent to the signed agreement modified the contract's termination provisions. It is indeed, as Cloverdale claims, well-established that subsequent oral modifications of a written contract may be valid notwithstanding a contract provision indicating that only written modifications are effective (*see Morley Brothers, Inc. v. F.R. Patterson Construction Co.*, 266 Mich. 52, 253 N.W. 213 (1934)), and despite proof of consideration for the subsequent modification (see *McCarty v. Mercury Metalcraft Co.*, 372 Mich. 567, 576, 127 N.W.2d 340 (1964)). But given the opportunity to present the court with facts sufficient to show a subsequent oral modification of the parties' written agreement, and thereby defeat summary judgment, Cloverdale failed to carry its burden. The only evidence it presented to prove that the parties had modified paragraph 11(a) was Moilanen's affidavit indicating that "both before and after the execution of this contract, it was presented to me that SAI was committed to a long-term distribution arrangement with Cloverdale and that Cloverdale's exclusive distributor status would not be terminated so long as Cloverdale performed its obligations under the agreement." Moilanen's affidavit does not state who made the statements and Cloverdale's answers to SAI's interrogatories indicate that the last oral representation occurred "between February 20, 1986 and March 28, 1986," *prior* to the final execution of the integrated contract in which all prior representations would necessarily have merged. *See NAG Enterprises, Inc. v. All State Industries, Inc.*, 407 Mich. 407, 410, 285 N.W.2d 770 (1979).

Michigan assigns the burden of proof of subsequent oral modification to the alleging party, *Rasch v. National Steel Corp.*, 22 Mich.App. 257, 177 N.W.2d 428, 429 (1970), and in light of a written-modification-only provision, vague assertions of an oral modification fail to raise a genuine factual issue sufficient to defeat a summary judgment motion. *Bushwick–Decatur Motors v. Ford Motor Co.*, 116 F.2d 675, 678 (2d Cir.1940). This holding in *Bushwick–Decatur Motors* is fortified by recent Supreme Court pronouncements with respect to the standards for summary judgment indicating that Rule 56 requires the party with the burden of proof to present specific facts showing the essential elements of its theory. *See Celotex*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Based upon Rule 56 and Michigan law, we find that the district court acted properly in dismissing Cloverdale's contractual theories of recovery.

## IV.

Cloeverdale also argues that the district court improperly granted summary judgment on a quasi-contractual claim for unjust enrichment, improperly declined to apply principles of estoppel, and improperly denied Cloverdale the opportunity for "equitable recoupment" pursuant to the so-called "Missouri rule" announced in *Lichnovsky v. Ziebart International Corp.*, 93 Mich.App. 60, 285 N.W.2d 795 (1979), *rev'd on other grounds*, 414 Mich. 228, 324 N.W. 2d 732 (1982). We disagree.

■ A quasi-contractual theory of recovery is inapplicable when the parties are bound by an express contract. *Randolph v. New England Mut. Life Ins. Co.*, 526 F.2d 1383, 1387 (6th Cir.1975). Moreover, although SAI benefitted from the sale to Cloverdale of nearly one million dollars worth of aerial lift equipment, Cloverdale received the equipment for which it bargained. SAI was not unjustly enriched. Although Cloverdale alleged that due to the contract termination it "was left with a one million dollar inventory of SAI equipment and parts which it could no longer service or sell competitively," it offered no

evidence that would support such a statement by showing, for example, that it could not re-sell the equipment.

■ With respect to its estoppel theory, Cloverdale alleges that, in reliance on *what it believed to be* a long term distribution agreement, it expanded and now has lost substantial funds as a result of the expansion of its Michigan facility. Concededly, losses suffered in reliance on representations may invoke estoppel principles even where the other party may not be enriched. But because promissory estoppel requires *reasonable* reliance, Cloverdale has no basis for invoking it here. In light of the unambiguously expressed terms to which Cloverdale assented indicating that either party could terminate the contract at will, we cannot conclude that reliance on vague assertions to the contrary was reasonable. *See, e.g., 3 P.M., Inc. v. Basic Four Corp.,* 591 F.Supp. 1350 (E.D.Mich.1984). Furthermore, Cloverdale presented the court with no evidence that any long term contract representations upon which Cloverdale might have relied were made *after* the parties contracted. Affidavits indicate that any oral representations pre-dated the contract. The parol evidence rule would have barred introduction of prior oral representations contradicting the express language of the written integrated contract.

■ Finally, Cloverdale argues that Michigan has adopted the "Missouri rule," and that this court is bound to do likewise. *See, e.g., Lichnovsky v. Ziebart International Corp.,* 93 Mich.App. 60, 285 N.W.2d 795 (1979), *rev'd,* 414 Mich. 228, 324 N.W. 2d 732 (1982).

Without deciding whether such a rule exists in Michigan, we need only note that in its discussion of the rule, the Michigan Supreme Court indicated that it is "a limitation fashioned by some courts to prevent a manufacturer or licensor from exercising an unrestricted power to terminate an agreement which does not specify time or duration or the manner of termination...." *Lichnovsky v. Ziebart International Corp.,* 414 Mich. 228, 245, 324 N.W.2d 732 (1982). The SAI/Cloverdale contract, however, contains express provisions detailing both the manner of termination and notice requirements to which both parties freely assented. *Lichnovsky*'s dicta indicates that the Missouri rule would not apply in Michigan to contracts in which the parties have expressly agreed to the terms and procedures applicable to termination.

V.

Finally, Cloverdale sought recovery based upon two theories of fraud: active misrepresentation and silent fraud. Cloverdale's complaint alleged that through both the representation of an intent to enter into a long-term distribution relationship and through concealment of its discussions with Caledonia, SAI fraudulently induced Cloverdale to agree to a contract terminable at will.

■ *Candler v. Heigho,* 208 Mich. 115, 121, 175 N.W. 141 (1919), sets forth the elements constituting active misrepresentation in Michigan. According to *Candler,*

The general rule is that to constitute actionable fraud it must appear: (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. Each of these facts must be proved with a reasonable degree of certainty, and all of them must be found to exist; the absence of any one of them is fatal to a recovery.

*See also United States Fidelity & Guaranty v. Black,* 412 Mich. 99, 114, 313 N.W. 2d 77 (1981). But "an action for fraudulent misrepresentation must be predicated upon a statement relating to a past or an existing fact. Future promises are contractual and do not constitute fraud." *Hi–Way Motor Co. v. International Harvester Co.,* 398 Mich. 330, 336, 247 N.W.2d 813 (1976). Although Michigan has a "bad faith" exception to the rule that statements relating to future actions are not actionable as

fraud, *see Hi–Way Motor,* 398 Mich. at 337–38, 247 N.W.2d 813; *Crowley v. Langdon,* 127 Mich. 51, 58–59, 86 N.W. 391 (1901), we have found no evidence of bad faith in SAI's actions. Cloverdale presented to the court memoranda evidence that SAI had discussed with Caledonia the possibility of its becoming an aerial lift distributor, but there is no evidence in those memos that SAI took active steps to cause Caledonia to break relations with its former distributor and no evidence that SAI knew at the time of contracting with Cloverdale that it would exercise its right to terminate the contract later that year in order to deal with Caledonia. Cloverdale failed to make any showing of bad faith and therefore cannot recover under a theory of misrepresentation for SAI statements relating only to future actions.

In support of its silent fraud claim, Cloverdale cites *United States Fidelity & Guaranty v. Black,* 412 Mich. 99, 313 N.W. 2d 77 (1981), for the proposition that it has a valid claim for silent fraud under Michigan law. *United States Fidelity* states, in relevant part:

> It is generally recognized that "[f]raud may be consummated by suppression of facts and of the truth, as well as by open false assertions," *Fred Macey Co. v. Macey,* 143 Mich. 138, 153, 106 N.W. 722 (1906), since "a suppression of the truth may amount to a suggestion of falsehood." *Stewart v. Wyoming Cattle Ranche Co.,* 128 U.S. 383, 388, 9 S.Ct. 101 [103], 32 L.Ed. 439 (1888). In order for the suppression of information to constitute silent fraud there must be a legal or equitable duty of disclosure.

412 Mich. at 125, 313 N.W.2d 77. In discussing the duty of disclosure, however, *United States Fidelity* also stated that "a party to a business transaction is under an obligation to exercise reasonable care to disclose to the other party, before the transaction is consummated, any subsequently acquired information which he recognizes as rendering untrue, or misleading, previous representations which, when made, were true or believed to be true." 412 Mich. at 127, 313 N.W.2d 77. We conclude, however, that this case is not one of subsequently acquired information rendering a prior statement misleading. Moreover, Cloverdale has not cited to the district court, or to us, any cases indicating, even by analogy, that a manufacturer has a duty to disclose its long range marketing plans to distributors.

The fact is, Cloverdale presented no credible evidence indicating that it was the victim of any "suggestion of falsehood." Rather, Cloverdale's dissatisfaction results, not from any tortious act performed by SAI, but from Cloverdale's agreeing to a contract terminable at will that it might not have agreed to if it had anticipated that SAI, and not Cloverdale, would be the first to exercise the termination right. Cloverdale frames the duty issue as a duty to disclose discussions of a master distributorship. But in light of the contract to which it assented, Cloverdale really asks this court to impose upon SAI, retroactively, a duty to inform Cloverdale at the time of contracting that SAI might choose to exercise the at-will termination provision of paragraph 11(a) if a better arrangement arises. Cloverdale had constructive notice of that option when it agreed to paragraph 11. Nothing more is required and this court is not empowered "to make a different contract for the parties or to look at extrinsic testimony to determine their intent when the words used by them are clear and unambiguous and have a definite meaning." *Michigan Chandelier Co. v. Morse,* 297 Mich. 41, 49, 297 N.W. 64 (1941).

AFFIRMED.