Ken STILTS,

v.

GLOBE INTERNATIONAL, INC.,[1] et al.

No. 3–94–0420.

United States District Court,
M.D. Tennessee,
Nashville Division.

Feb. 21, 1995.

---

1. As is explained in the subsequent footnote, the parties concede that the publication, the Globe, was not properly named as a defendant in this cause of action. Therefore, the only defendants properly before the Court are Globe International, Inc., and Bob Michals.

James F. Neal, John Claude Beiter, Neal & Harwell, Robert L. Sullivan, Manatt, Phelps & Phillips, Nashville, TN, for Plaintiff.

Alan Dale Johnson, Alfred H. Knight, Willis & Knight, Nashville, TN, Michael Brooks Kahane, Deutsch, Levy & Ingel, Chicago, IL, for Defendant.

## *MEMORANDUM*

HIGGINS, District Judge.

The Court has before it the defendants' motion (filed November 9, 1994; Docket Entry No. 38) for summary judgment and their brief (filed November 9, 1994; Docket Entry No. 40) in support, the plaintiff's response (filed November 29, 1994; Docket Entry No. 58), and the defendants' reply (filed January 27, 1995; Docket Entry No. 83).

Oral arguments on the defendants' summary judgment motion were heard by the Court on January 26, 1995.

This Court has jurisdiction pursuant to 28 U.S.C. § 1332.[2]

For the reasons set forth below, the Court shall grant the defendants' motion.

## I.

This controversy arises out of the publication of an article on April 5, 1994, in the Globe, a periodical published by the defendant, Globe International, Inc., which was written by the defendant, Bob Michals. The title of the article reads as follows: "Wynonna and Naomi: We were ripped off for $20 million!," with a subsequent sub-caption stating that "they blame ex-business manager, say pals."

The article reports criticisms allegedly voiced by Naomi and Wynonna Judd, musical artists who performed under the stage name, "The Judds," about their business relationship with the plaintiff, Ken Stilts, who was formerly their business manager. The article describes how the Judds maintain that Mr. Stilts had exploited his business relationship with them, to his financial advantage and their financial detriment. In the article, the Judds are also reported to have demanded an accounting of their business affairs from Mr. Stilts and to be exploring legal options. The article further relates that Mr. Stilts, through his attorney, completely denies any misappropriation or any illegal or improper behavior.

The plaintiff insists that this article insinuates that he has stolen money from the Judds, which impugns his honesty and integrity and damages his reputation and career as a manager of professional musical artists. In this regard, Mr. Stilts specifically avers that the following statements in the Globe article are capable of being understood in a defamatory sense and are therefore actionable:

(1) that Stilts "ripped off [the Judds] for $20 Million!";

(2) that Stilts "couldn't be trusted";

(3) that Stilts was "bleeding [the Judds] dry" and then "dump[ed] them";

(4) that Stilts "wound up with nearly $20 MILLION of the money [the Judds] earned, and they were left with only $5 million";

---

**2.** The plaintiff originally filed his libel complaint in the Circuit Court of Davidson County in May of 1994. The defendants removed the cause of action to this Court on May 17, 1994, based upon diversity jurisdiction. *See* notice of removal (Docket Entry No. 1).

There is no question of the Court's subject matter jurisdiction. During oral argument, the parties conceded that the Globe is not a legal entity having citizenship and, therefore, was not properly named as a defendant.

(5) that Stilts "threw a pile of papers on the table and yelled: 'You don't get it, do you? I don't care what you do anymore—we're through!'";

(6) that Stilts "pocketed most of what [the Judds] had earned";

(7) that Stilts "owns practically everything [the Judds] worked so hard for—even their cars"; and

(8) that Stilts "had the [Judds'] cars picked up from their driveways!"

Plaintiff's response (Docket Entry No. 58) at 21–22.

In contrast, the defendants insist that the contested article simply provides a substantially true and accurate account of a controversy between the Judds and Mr. Stilts and, therefore, is not actionable. Defendants' brief (Docket Entry No. 40) at 27–34. Furthermore, the defendants contend that summary judgment is appropriate because the published statements at issue are all either opinion or characterizing statements, substantially true or not defamatory and, therefore, do not constitute libel.[3] *See* defendants' reply (Docket Entry No. 83) at 3–9.

## II.

As provided by Federal Rule of Civil Procedure 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202, 211 (1986). In its consideration of the evidence, the Court must view all facts and inferences to be drawn therefrom in the light most favorable to the non-moving party. *Davidson & Jones Dev. Co. v. Elmore Dev. Co.,* 921 F.2d 1343, 1349 (6th Cir.1991).

In order to prevail on a summary judgment motion, the moving party bears the burden of proving the absence of a genuine issue of material fact concerning an essential element of the opposing party's action. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 274 (1986); *Davidson & Jones Dev. Co.,* 921 F.2d at 1349; *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989). An issue of material fact is one which, under the substantive law governing the issue, might affect the outcome of the suit. *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 211.

In addition, a dispute about the material fact must be genuine, that is, "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[4] *Id.* at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 211–12. Since the preponderance of the evidence standard is used in this determination, more than a mere scintilla of evidence in support of the plaintiff's position is required. *Id.* at 252, 106 S.Ct. at 2512, 91 L.Ed.2d at 214.

Once a motion for summary judgment has been made, "the non-moving party bears the responsibility to demonstrate that summary judgment is inappropriate under Rule 56(e)." *Davidson & Jones Dev. Co.,* 921 F.2d at 1349. The non-moving party may not merely rest on conclusory allegations contained in the complaint, but must respond with affirmative evidence supporting its claims and establishing the existence of a genuine issue of material fact. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553, 91 L.Ed.2d at 274; *Cloverdale Equip. Co. v. Simon Aerials, Inc.,* 869 F.2d 934, 937 (6th Cir.1989). While the disputed issue does not have to be resolved conclusively in favor of the non-moving party to defeat summary judgment, "sufficient evidence supporting the claimed factual dispute" must be shown, thereby requiring resolution of the parties' differing versions of the truth by a jury or judge. *Liberty Lobby,* 477

---

3. The defendants also assert that there is no evidence of negligence, much less clear and convincing evidence of actual malice, related to their investigation and publication of the contested article. *Id.* at 16. However, because the Court finds that the article in question is not defamatory, there is no need to address this issue.

4. The Supreme Court further explained that a court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2512, 91 L.Ed.2d at 214.

U.S. at 249, 106 S.Ct. at 2510, 91 L.Ed.2d at 212; *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569, 592 (1968).

## III.

As a threshold matter, the court must determine as a question of law whether the article is capable of being understood by readers as defamatory. *Memphis Publishing Co. v. Nichols*, 569 S.W.2d 412, 419 (Tenn.1978). As such, the statements "must reasonably be construable as holding the plaintiff up to public hatred, contempt or ridicule," thereby comprising a serious threat to the plaintiff's reputation. *Stones River Motors, Inc. v. Mid–South Publishing Co.*, 651 S.W.2d 713, 719 (1983). In making this determination, the Court is not bound by the plaintiff's interpretation of the words used but looks to the words themselves. *Id.*

In addition, because the damaging words must be factually false, if the statements in question are true or substantially true, they are not actionable. *Id.* The literal truth of every word need not be established; rather, it is sufficient to demonstrate that the "sting" or "gist" of the article is substantially true. As noted by the United States Supreme Court, "the statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517, 111 S.Ct. 2419, 2433, 115 L.Ed.2d 447, 472 (1991) (citing R. Sack, *Libel, Slander, and Related Problems* 138 (1980)). *See also Nichols*, 569 S.W.2d at 420 (question is "whether the libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced").

Likewise, in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20, 110 S.Ct. 2695, 2706, 111 L.Ed.2d 1, 19 (1990), the United States Supreme Court recognized constitutional protection for "statements that cannot 'reasonably [be] interpreted as stating actual

facts' about an individual," further noting the difference between "a subjective assertion" and "an articulation of an objectively verifiable event."[5] *Id.* at 22, 110 S.Ct. at 2707, 111 L.Ed.2d at 20. Accordingly, statements utilizing words in a loose, figurative manner or as imaginative expression, such as "rhetorical hyperbole," are not properly the subject of a defamation action. *Id.* at 17, 110 S.Ct. at 2705, 111 L.Ed.2d at 16. Similarly, the connotation resulting from a statement must be "sufficiently factual to be susceptible of being proved true or false" in order to be actionable. *Id.* at 21, 110 S.Ct. at 2707, 111 L.Ed.2d at 19.

## IV.

The dispositive question before the Court is similar to that posed in *Milkovich*, namely, whether a reasonable factfinder could conclude that the statements in question were defamatory. *Id.* After a careful examination of the record, the Court concludes that the Globe article is not defamatory.

Although the article is cleverly written in order to heighten interest and sensationalize its contents for the tabloid press, when read for a true appreciation of the subject matter, it is clear that the article simply recounts the existence of an actual controversy between the Judds and Mr. Stilts, with comments attributed to the respective participants. The article specifically identifies statements provided by friends of the Judds and additionally balances such comments with statements which are attributed to the plaintiff's attorney.

Examination of the article reveals that its headline clearly identifies the Judds as the parties who believe that they were "ripped off" and that their former business manager was responsible. *See* defendants' motion (Docket Entry No. 38), exhibit 1. The very language used, which is decidedly "imaginative expression" or "rhetorical hyperbole," indicates that this statement cannot reasonably be construed as stating actual facts about Mr. Stilts. *Milkovich*, 497 U.S. at 20,

---

**5.** In *Milkovich*, the Supreme Court rejected a wholesale defamation exemption for "opinions," noting that existing constitutional doctrine adequately protects such expression. *Id.* at 19, 110 S.Ct. at 2706, 111 L.Ed.2d at 18.

110 S.Ct. at 2706, 111 L.Ed.2d at 19. Such figurative language, which is subjective, imprecise and subject to numerous interpretations, is simply incapable of verification or refutation by means of objective proof. Contrary to the plaintiff's assertions,[6] it is impossible to believe that any reader of this headline would have understood the Globe to be charging Mr. Stilts with committing the crime of stealing or with any other improper act. Rather, a reader would understand the words for their obvious meaning, namely, that the Judds blame their former business manager for having lost money.

Likewise, it is impossible to believe that any reader could construe the text of the article as defamatory. The text clearly describes a controversy in which the Judds contend that Mr. Stilts exploited their business relationship with him to their financial detriment and his financial gain, while the plaintiff disputes these contentions and denies any wrongdoing. *See* defendants' motion (Docket Entry No. 38), exhibit 1. The language employed within the text[7] is the very "sort of loose, figurative or hyperbolic language which would negate the impression that the writer was seriously maintaining that" the plaintiff committed the misdeeds in question. *Milkovich,* 497 U.S. at 21, 110 S.Ct. at 2707, 111 L.Ed.2d at 19. Such figurative language is incapable of objective verification and, therefore, cannot reasonably be interpreted as stating actual facts about Mr. Stilts. In short, the article cannot reasonably be construed as stating that Mr. Stilts did *in fact* exploit his business relationship with the Judds or engage in any financial wrongdoing.[8]

Moreover, it is readily apparent that this controversy between the Judds and Mr. Stilts indeed exists and has, in fact, ripened into litigation.[9] The record is replete with documentation of this controversy's existence. For example, Naomi Judd testified in her deposition that the Judds had a meeting with Mr. Stilts to terminate their business

---

**6.** The Court notes that in his rendition of the allegedly defamatory statements, the plaintiff only quotes part of the headline and, significantly, leaves out any reference to the Judds. However, the headline obviously attributes the statement concerning loss of money to the Judds. Therefore, a factfinder could not reasonably construe this headline as stating for a fact that Mr. Stilts' had misappropriated or stolen money.

**7.** Examples include phrases such as the following: "bleeding them dry for 10 years—then dumping them"; "have the rug jerked out from under you"; "when she found out Ken couldn't be trusted, her whole world collapsed around her"; "Once Wynonna read them, she immediately realized that he'd pocketed most of what she and her mom had earned"; "Now he owns practically everything they worked so hard for"; and "By giving Ken power of attorney, they had basically signed their lives away without knowing what they were doing." *See* defendants' motion (Docket Entry No. 38), exhibit 1.

The Court further notes that the connotations which could be drawn from some of the opinions attributed to the Judds or their friends are simply not "sufficiently factual to be susceptible of being proved true or false." *Milkovich,* 497 U.S. at 21, 110 S.Ct. at 2707, 111 L.Ed.2d at 19.

**8.** As was the case with the article's headline, the plaintiff has plucked phrases out of context and totally ignored the fact that many of the contested statements are opinions of the Judds or their friends, rather than assertions of fact. An obvi-

ous example of this is the plaintiff's allegation that one defamatory statement in the article was "that Wynonna Judd was 'betrayed and used' by Mr. Stilts," *see* plaintiff's statement (filed November 29, 1994; Docket Entry No. 59) at 1, when in fact the article specifically reads as follows: "She [Wynonna] *felt* betrayed and used" (emphasis added). *See* defendants' motion (Docket Entry No. 38), exhibit 1. Similarly, the plaintiff alleges that the article states "that Mr. Stilts has been 'bleeding [the Judds] dry for 10 years,'" *see* plaintiff's statement at 1, when in fact the article reads thusly: "Wynonna and Naomi Judd have accused their former manager of bleeding them dry for 10 years." *See* defendants' motion, exhibit 1.

**9.** The Judds have filed a complaint against Steven Pritchard and Pro Tours, Inc., in which they allege fraud, breach of fiduciary duty, breach of contract, unjust enrichment, and conversion. *See* defendants' motion (Docket Entry No. 38), exhibit 7. Pro Tours, Inc., is a company which is jointly owned by Mr. Stilts, Steve Pritchard, Naomi Judd and Wynonna Judd. The Judds have also filed a complaint against the law firm which purportedly represented the Judds and Mr. Stilts simultaneously, in which they allege professional negligence and breach of fiduciary duty. *See* defendants' reply (Docket Entry No. 83), exhibit B. Results of the above litigation are as yet unknown as both cases, which were filed in the Circuit Court of Davidson County, are still pending.

relationship because they "felt that he had grossly abused his fiduciary role" and that "misappropriation of funds" was discussed. Naomi Judd deposition (Docket Entry No. 38), exhibit 6 at 59, 63. Mr. Stilts himself acknowledges that during this heated meeting, Naomi said something to the effect of "How could you take money from me and Wynonna?" Stilts deposition (filed January 27, 1995; Docket Entry No. 86) at 166. *See also* Naomi Judd deposition at 66. In their depositions, the Judds describe numerous aspects of their business relationship with Mr. Stilts which they found troublesome [10] and which are disputed by the plaintiff.

The plaintiff has acknowledged the existence of certain other circumstances which the Judds consider to be objectionable. For example, it is undisputed that Mr. Stilts received a bonus from Pro Tours, Inc., of $250,000, while Naomi and Wynonna Judd each received only $80,000, Stilts deposition at 107–08; Naomi Judd deposition at 65, 87, and that the plaintiff's company owns the copyright for the Judds' farewell pay per view concert. Stilts deposition at 249; Naomi Judd deposition at 87. It is undisputed that audits of Pro Tours and Ken Stilts Company were conducted at the Judds' request. Stilts deposition at 142–43.

Although the precise accuracy of several specific details set forth in the article is disputed,[11] the overall effect of the published account would not have "a different effect on the mind of the reader from that which the pleaded truth would have produced." *Masson*, 501 U.S. at 517, 111 S.Ct. at 2433, 115 L.Ed.2d at 472. Therefore, the "gist" or substance of the article is accurate. Accordingly, based upon the evidence before it, the Court finds that the article in question is substantially true and that no reasonable jury could conclude otherwise. *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1228 (7th Cir.1993).

V.

In summary, the "gist" of the Globe article is simply a sensationalized report of a rather garden variety controversy that is remarkable only in that it involves performers and their former manager in the music industry. The fact that some of the participants are celebrities no doubt titillates the interest of that segment of the public which eagerly devours intimate details about the private lives of famous people. However, this does not alter the substance or "gist" of the article, which is that the plaintiff is involved in a dispute with the Judds concerning their dissatisfaction with their prior business relationship with him. Although certain details are vigorously disputed, the fact and substance of this controversy cannot be denied.

As such, the Court finds that no reasonable factfinder could conclude that the article is defamatory and, therefore, the defendants' motion for summary judgment shall be granted.

An appropriate order shall be entered.

---

10. For example, the Judds assert that they believed they owned Pro Tours, Inc., and only later found out that together they owned only one-third of the company, while Mr. Stilts and Mr. Pritchard each owned one-third. Naomi Judd deposition at 64–65; Wynonna Judd deposition (Docket Entry No. 38), exhibit 8 at 43–44. The Judds further contend that, unbeknownst to them, Mr. Stilts owned and leased their buses to them for use while touring. Naomi Judd deposition at 68–69; Wynonna Judd deposition at 39. Naomi Judd also complained that Mr. Stilts received his twenty percent commission off the gross receipts from their pay per view farewell concert, while the Judds had to pay $1.4 million in production expenses and made less than the plaintiff as a result. Naomi Judd deposition at 68.

11. While it appears that the article's recitation that Mr. Stilts threw a pile of papers on the table and yelled particular words during his meeting with the Judds is not accurate, this has no bearing on the Court's determination. Any dispute about this fact is neither material nor genuine since it would not significantly affect the average reader's understanding of the article and does not affect the "gist" or "substantial truth" of the writing. This is also true with regard to whether the Judds' buses, rather than their cars, were actually owned by Stilts and whether the Judds' cars were removed from their driveways.