**AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA, Plaintiff,**

v.

**Frederick H. RAHN; William K. Rahn; Franklin H. Smith; Thomas W. Smith; Richard S. Hennes; and Resolution Trust Corporation, Defendants.**

No. 1:93:CV:49.

United States District Court, W.D. Michigan.

June 6, 1994.

---

**494**

Drew F. Seaman, Straub, Seaman & Allen, St. Joseph, MI, Kristi Ann Gleim, Michael P. Tone, Peterson & Ross, Chicago, IL, for plaintiff.

Alfred M. Butzbaugh, Butzbaugh & De-wane, St. Joseph, MI, for Frederick H. Rahn, William K. Rahn, Richard S. Hennes.

Paul A. Taglia, Taglia, Fette, Dumke, Passaro & Kahne, St. Joseph, MI, for Franklin H. Smith.

Richard C. Sanders, Hill & Lewis, Detroit, MI, Peter A. Metters, Hill Lewis, Detroit, MI, Terry S. Arbit, Resolution Trust Corp., LS Div., Washington, DC, for Resolution Trust Co.

## OPINION

ENSLEN, District Judge.

This matter is before the Court on plaintiff American Casualty Company of Reading, Pennsylvania's (ACC) motion for summary judgment. ACC seeks a declaratory judgment that it is not required to provide coverage under director and officer liability policies issued to Peoples Savings Association of St. Joseph, Michigan (PSA), covering from 1981 to 1988. Also before the Court is defendant outside directors' motion to require ACC to pay for their defense of the suit brought against them by the Resolution Trust Corporation.

PSA was placed into receivership in 1990. On March 5, 1992, the Resolution Trust Corporation (RTC) filed suit in this Court, case no. 1:92–CV–174, against certain former directors and officers of PSA based on their alleged conduct concerning several loans and investments made by PSA in 1983 and 1984. This Court recently denied in part defendant directors' motion for summary judgment in that case.

The first policy at issue was effective from June 30, 1981 until June 30, 1984.[1] In June 1984, PSA requested renewal of the policy. A binder for renewal was issued in mid-July 1984 to provide temporary coverage pending issuance of the subsequent policy. The agent for PSA received the actual policy on August 3, 1984.[2] A third policy was issued for a period of one year, expiring on June 30, 1988; however, defendants do not contend that a claim has been made under this policy. All three policies were on a "claims made" basis.[3]

The 1984 policy included a "regulatory exclusion" which excluded coverage for claims by or on behalf of regulatory agencies, such

---

**1.** This policy was actually issued by MGIC Indemnity Corporation. In October 1983, CNA Insurance Companies assumed the rights and obligations of MGIC under the 1981–84 policy. ACC is a member of the CNA Insurance Group, and it issued the subsequent policies.

**2.** Franklin Smith, of Rutz–Smith, Inc., was designated by PSA in 1981 as the agent of record for the Officers and Directors Liability Insurance policies. Interestingly, he was also an outside director of PSA and covered by the policies.

**3.** The interpretation of "claims made" and what constitutes a claim during the policy period will be discussed *infra*.

as the FDIC. PSA and Franklin Smith were aware sometime in 1984 of the exclusion and the resulting reduction in coverage. PSA's president and Franklin Smith had discussed it, and, in Spring 1985, attempted, ultimately unsuccessfully, to have ACC remove the exclusion.

PSA entered into a Supervisory Agreement with the Federal Home Loan Bank Board (FHLBB) on May 27, 1987, prior to the expiration of the 1984 policy. The agreement stated that the FHLBB was of the opinion that PSA violated certain statutes and regulations and engaged in unsafe or unsound business practices. PSA agreed to take several actions in order to avoid the initiation of cease-and-desist proceedings. Franklin Smith, who was also a director of PSA, had notice of this agreement at that time.

The Supervisory Agreement noted that the board of directors was ultimately responsible for the sound management of PSA and provided that the board would actively fulfill its fiduciary duty toward that end. There was no indication in the agreement of any specific acts or omissions on the part of the board. Also, there was no indication that the FHLBB was planning on any action against the individual directors or officers of PSA.

There is no evidence that ACC was ever informed about this agreement prior to 1992, except for Franklin Smith's awareness of it.

**Standard for Summary Judgment**

In reviewing a motion for summary judgment pursuant to Rule 56, this Court should only consider the narrow questions of whether there are "genuine issues as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). On a Rule 56 motion, the Court cannot resolve issues of fact, but is empowered to determine only whether there are issues in dispute to be decided in a trial on the merits. *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir.1987); *In re Atlas Concrete Pipe, Inc.*, 668 F.2d 905, 908 (6th Cir. 1982).

The crux of the motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986); *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1310 (6th Cir.1989).

A motion for summary judgment requires this Court to view " 'inferences to be drawn from the underlying facts ... in the light most favorable to the party opposing the motion.' " *Matsushita Electric Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962)), *quoted in Historic Preservation Guild v. Burnley*, 896 F.2d 985, 993 (6th Cir.1989). On the other hand, the opponent has the burden to show that a "rational trier of fact [could] find for the non-moving party [or] that there is a *'genuine issue for trial.'* " *Historic Preservation*, 896 F.2d at 993 (quoting *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356).

As the Sixth Circuit has recognized and consistently emphasized, recent Supreme Court decisions encourage the granting of summary judgments where there are no material facts in dispute. *Historic Preservation*, 896 F.2d at 993 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 242, 106 S.Ct. at 2505).

The courts have noted that the summary judgment motion may be an "appropriate avenue for the 'just, speedy and inexpensive determination' of a matter." *Cloverdale Equipment Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 937 (6th Cir.1989) (quoting *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555). Consistent with the concern for judicial economy, "the mere existence of a scintilla of evidence in support of the [non-moving party's] positions will be insufficient." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512. "Mere allegations do not suffice." *Cloverdale*, 869 F.2d at 937. "[T]he party with the burden of proof at trial is obligated to provide concrete evidence supporting its claims and establishing the existence of a genuine issue of fact." *Id.*

## DISCUSSION

The policies issued by ACC to PSA were on a claims made basis. The 1981 and 1984 policies both stated as follows:

> [I]f, during the policy period, any claim or claims are made against the Directors and Officers, individually or collectively, for a Wrongful Act, the Insurer will pay, in accordance with the terms of this policy, on behalf of the Directors and Officers or any of them, their heirs, legal representatives or assigns all Loss which the Directors and Officers or any of them shall become legally obligated to pay.

Paragraph 6(a) of both policies provided:

> If during the policy period [PSA] or the Directors or Officers shall (i) receive written or oral notice from any party that it is the intention of such party to hold the Directors or Officers, or any of them, responsible for a Wrongful Act, or (ii) become aware of any occurrence which may subsequently give rise to a claim being made against the Directors and Officers, or any of them, for a Wrongful Act, and shall, during such period, give written notice thereof to the Insurer as soon as practicable and prior to the date of termination of the policy, then any claim which may subsequently be made against the Directors or Officers arising out of such Wrongful Act shall, for the purpose of this policy, be treated as a claim made during the policy year in which such notice was given.

Also, paragraph 6(b) provided that PSA "or the Directors or Officers shall, as a condition precedent to their rights under this policy, give to the Insurer notice in writing as soon as practicable of any claims made and shall give the Insurer such information and cooperation as it may reasonably require." Paragraph 6(c), as amended by Endorsement 1 of the 1984 policy, provides that "[n]otice hereunder shall be given to either a) MGIC Indemnity Corporation, Directors' and Officers' Liability Insurance Division, MGIC Plaza, Milwaukee, Wisconsin 53201, or b) any authorized agent of the Insurer within the State of Michigan."

Generally, a "claims made" policy is one in which indemnity is provided no matter when the alleged error or omission or act of negligence occurred, provided the misdeed complained of is discovered and the claim for indemnity is made against the insurer during the policy period. *Stine v. Continental Cas. Co.*, 419 Mich. 89, 97, 349 N.W.2d 127 (1984). "[T]he provision of the insuring agreement which is critical to establishing liability in such policies is the time at which the injured third person's claim is made against the insured." *Id.* at 105, 349 N.W.2d 127. "The only exception [under the ACC policy] is if the insureds become aware of occurrences during the policy period and give proper notice." *American Cas. Co. of Reading, Pa. v. F.D.I.C.*, 821 F.Supp. 655, 663 (W.D.Okla. 1993) (construing the same general policy language).

Regarding the notice provision, Michigan law provides that "notice given ... to any authorized agent of the insurer within this state ... shall be deemed to be notice to the insurer" and "failure to give any notice required to be given by such policy within the time specified therein shall not invalidate any claim made by the insured if it shall be shown not to have been reasonably possible to give such notice within the prescribed time and that notice was given as soon as was reasonably possible." *Stine*, 419 Mich. at 104, 349 N.W.2d 127 (quoting Mich.Comp. Laws § 500.3008).

ACC contends that there was no claim made during the policy period and that it received no notice of the subject claim until January 1992, over three years after its last policy expired.[4]

### Sufficiency of the 1987 "claim"

■ As noted above, the 1987 Agreement with the FHLBB noted the agency's opinion that PSA had violated laws and regulations and engaged in unsound business practices. PSA agreed to take various corrective actions and to obtain approval from the Supervisory Agent prior to making any new invest-

---

4. At this point, I will note that ACC's brief is full of case citations that are missing page numbers. While a few such omissions may be understanda- ble, I consider the rampant failure to properly identify citations as being quite discourteous to the Court and to the opposing parties.

ments. The issue is whether this agreement constitutes a sufficient "occurrence" which may subsequently give rise to a claim.

I believe that most of the authorities cited by ACC can all be distinguished from the present case. One case involved policy language requiring notification of "any act, error, or omission which may subsequently give rise to a claim being made . . . for a specified Wrongful Act." [5] Another case involved a Supervision Agreement wherein the FHLBB promised not to bring any claims and the insured had responded on a renewal application that it had no knowledge of any act, error, or omission which might give rise to a claim.[6]

However, the Fifth Circuit recently interpreted policy language similar to the language in the policies in this case, which provided that directors had to give written notice "of the material facts and circumstances relating to such Wrongful Act as . . . having the potential of giving rise to a claim being made against any Insured Person. . . ." *F.D.I.C. v. Barham,* 995 F.2d 600, 602 (5th Cir.1993). The court found that it meant that "the directors had to give written notice of the specific acts they considered to have claim potential." *Id.* at 605. The primary difference in policy language is that the policy in the present case requires notice of "any occurrence which may subsequently give rise to a claim," rather than requiring the "material facts and circumstances." I find this difference to be inconsequential.

In *Barham,* the agent for the insurance company discovered a "Letter of Agreement" between the Agency and the bank in which the bank agreed to "adopt and implement certain policies and procedures to prevent future violations of law and regulation." *Id.* at 604. The FDIC contended that this discovery constituted sufficient constructive notice to the insurer of the "facts and circumstances with claim potential." *Id.* at 605.

The court in *Barham,* however, found that even if "constructive notice could suffice," the insurer's "knowledge of general bad practices

did not satisfy" the requirement of notifying of "facts and circumstances . . . having the potential to give rise to a claim." *Id.* The insurer, at most, "possessed information that regulators disapproved and criticized some of [the bank's] banking relationships and loan transactions." *Id.* The information did not identify which specific acts by the officers or directors had claim potential. *Id.*

I agree with the reasoning in *Barham* and hold that the Supervising Agreement did not sufficiently identify any specific acts which had claim potential. There is no evidence that PSA or ACC had any information concerning specifically "wrongful acts" by the directors in handling the Florida loans which are the subject of the RTC's suit. Accordingly, there was no claim or sufficient notice of an "occurrence which may subsequently give rise to a claim" received within the policy period.

## Notice to ACC

I also find that defendant directors and PSA did not comply with the notice provision in the policy. Not only was notice insufficient substantively, but as discussed above, there was no notice provided to ACC.

Paragraphs 6(a) and 6(b) of the policy, as amended, state that written notice of the claim or the occurrence which may give rise to a claim must be provided to the to the insurer or the insurer's authorized agent of any claims made "as soon as practicable."

■ Defendants contend that Franklin Smith was given notice of the Supervising Agreement with the FHLBB and that he was an authorized agent of ACC. As noted above, Mr. Smith's insurance firm, Rutz–Smith Agency, Inc. was designated by PSA in May 1981 as "the agent of record for Officers and Directors Liability Insurance" which PSA had with MGIC, and its successor, ACC. The question is whether Mr. Smith was an "authorized agent" of ACC.

Defendants assert that Mr. Smith signed the insurance binder issued in June 1984 on

**5.** *McCullough v. Fidelity & Deposit Co.,* 2 F.3d 110, 112 (5th Cir.1993).

**6.** *American Cas. Ins. Co. of Reading, PA v. Resolution Trust Corp.,* 845 F.Supp. 318 (D.Md.1993) (Exh. F to ACC's memorandum in support of its motion).

behalf of CNA. However, according to his deposition, Mr. Smith stated that he did so only after he was specifically given authorization by someone from ACC.

"An insurance agent who is furnished with blank applications and with policies, duly signed by the company's officers, and has been authorized to issue policies by simply signing his name as an agent, to collect premiums, and to cancel policies without consulting the home office," falls within the rule that general insurance agents "having apparent authority to issue contracts of insurance without reference to the home office are empowered to waive conditions of forfeiture in such policies; and their knowledge is the knowledge of the insurer...." *Hawkeye Cas. Co. v. Holcomb,* 302 Mich. 591, 606, 5 N.W.2d 477 (1942) (quoting 29 Am.Jur. p. 628 § 825).

"An independent agent, or insurance broker, is ordinarily the agent of the insured," not the insurer. *Mayer v. Auto-Owners Ins. Co.,* 127 Mich.App. 23, 26, 338 N.W.2d 407 (1983). Notice to an insurance broker is held not to be effective as notice to the insurer. 44 Am.Jur.2d *Insurance* § 1349, at 280 (1982). An independent agent that represents the interests of insureds before representing the interests of insurers is not an agent of the insurer. *Smart v. New Hampshire Ins. Co.,* 148 Mich.App. 724, 735-36, 384 N.W.2d 772 (1985).

Here, Mr. Smith stated he was the "agent of record" and never said he was MGIC's or ACC's agent, contrary to representations in defendants' brief. In 1981, PSA designated him as PSA's agent for directors' and officers' liability policies. His firm is an independent agent, and, presumably, he could have placed this type of insurance with another carrier, if another carrier for whom his firm brokered carried such insurance. He acknowledged that he needed specific authorization from ACC to sign PSA's insurance binder in 1984. When he attempted in April 1985 to have the Regulatory Exclusion Endorsement removed, ACC ultimately declined the request, which indicates his lack of authority. Finally, Mr. Smith was not only PSA's agent, he was also a director of PSA,

and an Insured under the policies issued by ACC and its predecessor.

I find that Mr. Smith was an independent agent, and that he represented the interests of PSA, rather than ACC. He was not authorized generally to bind ACC regarding insurance or modifications of policies. He needed specific authorization to bind over the 1984 policy. He lacked authority to remove the Regulatory Exclusion. In short, Mr. Smith was not an "authorized agent" of ACC for the purposes of receiving notice of occurrences that may lead to claims.

■ Furthermore, even if Mr. Smith was found to be an authorized agent of ACC, the unique facts of this case indicate that his knowledge should not be deemed as notice to ACC. Mr. Smith was an outside director of PSA, and he learned about the FHLBB's concerns and the Supervisory Agreement through his position as a director. He did not learn about this information in his capacity as an insurance agent. There is no evidence that his insurance firm, Rutz-Smith Agency, ever possessed written notice of this information prior to 1990. Finally, as a director of PSA, Mr. Smith had conflicting interests at the time regarding himself, PSA and ACC.

I agree with *Continental Cas. Co. v. Allen,* 710 F.Supp. 1088, 1093, 1094 (N.D.Tex.1989), that notice to Mr. Smith in his capacity as a director should not suffice and should not be imputed to ACC. For this notice to have been effective, "the insurance agent in this case must have affirmatively communicated any knowledge he had to the plaintiff in order to clothe the defendants with coverage under the 1980 policy." *Id.* at 1093-94. Because Mr. Smith did not communicate his knowledge of the Supervisory Agreement or the information within it to ACC within the policy period or within a reasonable time of PSA's learning of it, I agree with *Allen* that the notice, even if the substance had been sufficient, was not effective to trigger coverage under the policy.

## Regulatory Exclusion Endorsement

■ Unlike the 1981 policy, the 1984 policy from ACC included as Endorsement # 4

the following "General Limitation of Coverage":

It is understood and agreed that the Insurer shall not be liable to make any payment for Loss in connection with any claim made against the Directors or Officers based upon or attributable to:

any action or proceeding brought by or on behalf of the [FDIC], [FSLIC], any other depository insurance organization, ... the FHLBB, or any other national or state regulatory agency ..., including any type of legal action which such Agencies have the legal right to bring as receiver, conservator, liquidator or otherwise; whether such action is brought in the name of such Agencies or by or on behalf of such Agencies in the name of any other entity or solely in the name of any Third Party.

*Ambiguity*

Defendant RTC contends that this exclusion is ambiguous and capable of more than one interpretation. Although the introductory clause, which is preprinted on the endorsement form and apparently used as the initial clause for certain exclusions,[7] creates an awkward transition to the subsequent language, I do not find the endorsement ambiguous. The alternative interpretation offered by defendant RTC is not a reasonable interpretation of the language.

First, I note that the FHLBB recognized in 1984 that these Regulatory Exclusions were being inserted into recent directors and officers liability insurance policies, and that insurance coverage is "considerably reduced in value if there is no provision for liability protection in the event the Board elects to file suit against the directors or officers of a savings and loan which has failed or otherwise engaged in unlawful, unsound or imprudent practices." Exh. A to defendants opposition brief (Exh 3 to Smith Dep.) I believe defendant RTC is being disingenuous in suggesting that it does not believe the endorsement clearly excludes coverage for its suit against the defendant directors.

Defendant RTC suggests that a reasonable person could read the endorsement to mean only that the insurer would not cover losses caused by "secondary suits," i.e., suits brought after, and based upon, a suit by the depository agency. Some district courts have agreed with this position and that it was not a strained or unnatural reading of the language. *See F.S.L.I.C. v. Heidrick,* 774 F.Supp. 352, 360 (D.Md.1991), *rev'd,* 812 F.Supp. 586, 589 (after reconsideration following a state court ruling), *aff'd, F.D.I.C. v. American Gas Co.,* 995 F.2d 474 (4th Cir. 1993); and *American Cas. Co. v. F.D.I.C.,* 677 F.Supp. 600, 603 (N.D.Iowa 1987), *rev'd,* No. C86–4018, 1990 WL 66505 (N.D.Iowa 1990).

"An insurance contract is 'ambiguous' ... if, after reading the entire contract, the language can be understood in different ways." *State Farm Mut. Ins. Co. v. Snappy Car Rental, Inc.,* 196 Mich.App. 143, 151, 492 N.W.2d 500 (1992), *appeal denied,* 442 Mich. 884, 500 N.W.2d 479 (1993). "If an ambiguity exists, the policy must be construed in favor of the insured." *Group Ins. Co. of Michigan v. Czopek,* 440 Mich. 590, 595, 489 N.W.2d 444 (1992). However, "clear and specific exclusions must be enforced." *Id.* at 597, 489 N.W.2d 444.

The Fourth Circuit considered the alternative interpretation of the ACC Regulatory Exclusion that was suggested by RTC and concluded that it was "strained." *F.D.I.C. v. American Cas. Co. of Reading, PA,* 975 F.2d 677, 680 (4th Cir.1992) (citing similar holdings in several other cases). Although recognizing that the phrase "based upon or attributable to" was awkward, the phrase was used in front of specific descriptions of other general exclusions in the policy involved in that case, and it was used "as a link between the specific type of claim excluded and the more general excluding language," such as excluding "claims made by any other Director or Officer or by the Institution...." *Id.*

"The [Agency's] interpretation of the exclusion is untenable because it ignores the role of 'based upon or attributed to.' Inter-

---

**7.** I note that several endorsements in the 1987 include a very similar introductory clause for various exclusions.

preting the regulatory exclusion to preclude coverage for both direct and secondary suits, however, grants each portion of the exclusion its due." *Id.* I agree entirely with the Fourth Circuit on this issue. The regulatory exclusion is not ambiguous and, if effective, would prevent recovery under the 1984 policy.

### Public Policy Violation

Defendant RTC asserts that enforcement of the Regulatory Exclusion would violate public policy in that RTC was given broad powers to preserve the integrity of the nation's financial system; and this Exclusion would preclude RTC from securing monetary recovery from ACC for the liability, if any, of the directors, if any. Further, the RTC, by statute and by virtue of being a receiver for ACC, was to succeed to all "rights, titles, powers, and privileges" of failed institutions and their stockholders and depositors. *See* 12 U.S.C. § 1821(d)(2)(A).

■ Invalidation of a contract provision on policy grounds is limited to a situation where it violates a well defined, dominant, explicit public policy. *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 42, 108 S.Ct. 364, 373, 98 L.Ed.2d 286 (1987).

"The regulatory exclusions in these policies frustrate the [agency] in its attempts to assert the claims of depositors and shareholders against the Directors because the absence of insurance coverage lessens the probability of recovery of the large sums of money involved." *F.D.I.C. v. American Cas. Co.,* 975 F.2d at 681.

The legislative history of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), which includes the establishment of the RTC and 12 U.S.C. § 1821(k) (concerning the liability for monetary damages of directors and officers to the agency), reveals that Congress was aware of the existence of regulatory exclusions and chose to remain neutral as to their validity. *Id.* at 681–82 (citing S.Rep. No. 19, 101st Cong., 1st Sess. 315 (1989) and 135 Cong Rec. S10192, S10198 (101st Cong., 1st Sess. August 4, 1989) (comments of Sen. Garn, a sponsor of the bill)).

In fact, "FIRREA originally included a provision allowing the FDIC to require directors' and officers' liability policies to remain in effect despite contrary provisions of the contract. This provision was deleted, however, because the committee believed insurers charged premiums based upon the validity of the regulatory exclusion provisions, so that the effect of invalidation would be to increase retroactively the exposure of insurers." *F.D.I.C. v. American Cas. Co.,* 995 F.2d 471, 473 (4th Cir.1993).

Finally, "public policy does not create insurance coverage that never existed: 'FDIC argues [as RTC argues in this case] that to hold the regulatory endorsement enforceable gives the parties the right to bargain away FDIC's statutory right to marshal and collect assets.' However, the FDIC overlooks the very important fact that in order to marshal and collect an asset, the failed bank must have it as an asset. Here, the bank did not own as an asset directors' and officers' liability insurance without an FDIC endorsement [during the period when it is asserted a claim was made]. Therefore, such argument fails...." *Fidelity & Deposit Co. of Maryland v. Conner,* 973 F.2d 1236, 1243 (5th Cir.1992) (quoting with approval *Allen,* 710 F.Supp. at 1099–100). "In fact, it would not have been against public policy for the Bank to have purchased no D & O coverage at all." *Id.*

The other circuits to consider the argument that the endorsement violates public policy have rejected it. *F.D.I.C. v. American Cas. Co.,* 995 F.2d at 473 (citing the Fifth, Eighth, and Tenth Circuits); *see also, American Cas. Co. of Reading, PA v. Baker,* 22 F.3d 880, 894 (9th Cir.1994) (also finding the exclusion not to violate any clearly established public policy).

For each of the above reasons, I find that defendants have failed to demonstrate that the Regulatory Exclusion violates established public policy.

### Applicability of the 1984 Policy

As noted above, defendants contend that the "claim" under the ACC policies occurred in mid-1987, which was within the period covered by the 1984 policy. Unlike the 1981 policy, the 1984 policy had the Regulatory

Exclusion upheld above. Defendants seek to have this Court find that ACC committed wrongful conduct in the manner in which it secured the 1984 policy "renewal." As a result they unknowingly purchased a policy with significantly less coverage than the preceding policy, and the subsequent policy should not be considered a "renewal" but rather an offer of a lesser policy with a "refusal to renew." They contend that ACC's conduct deprived them of purchasing a discovery period.

Defendants appear to seek two possible remedies: either they should be allowed to now purchase discovery coverage or the policy should be reformed to exclude the Regulatory Exclusion.

The policy was renewed in mid-July 1984 using a binder. No mention was made by ACC that coverage would be reduced significantly or that the Regulatory Exclusion Endorsement was going to be attached. When the actual policy was sent to PSA in early August 1984, there was no notification that the "renewal" was not of the identical coverage. The standard policy form remained unchanged but it had attached to it some extra endorsements including the Regulatory Endorsement.

Various CNA underwriters have admitted that the approach to renewals being undertaken in 1984 with respect to renewals was to "renew" on more restrictive terms, and to not issue a notice of cancellation or refusal to renew. One purpose of this approach, according to CNA underwriters, was to avoid having insureds elect to purchase a discovery period. This discovery period provided for coverage of claims which the insured became aware of during the twelve months following the expiration of the underlying policy, so long as the claim related to conduct that occurred prior to the expiration date of the underlying policy. In effect, it provided an extended period during which the insured may "discover" the existence of a claim based on the prior conduct.

Franklin Smith, the insurance agent for PSA and a director of PSA, discussed the Regulatory Endorsement with the president of PSA sometime in 1984. He was not aware of the endorsement at the time of the binder

or at the time the policy was sent in August 1984. It appears that for a period of time in 1984, PSA may have reasonably, though mistakenly, believed that it had renewed the same coverage as was provided in the 1981 policy, i.e., there was no exclusion for claims such as the suit by RTC that ultimately was filed.

 I agree with defendants that the policy may not have been a "renewal." When, as here, an insurer offers a "renewal" policy which contains substantially different terms than existed in the preceding policy, it is refusing to renew the previous policy. *See Russell v. State Farm Mut. Automobile Ins. Co.*, 47 Mich.App. 677, 681, 209 N.W.2d 815 (1973) and *McCuen v. American Cas. Co. of Reading, Pa.*, 946 F.2d 1401, 1404–05 (8th Cir.1991). Nevertheless, there is no evidence that ACC informed PSA that the policy it was offering was not a "renewal" providing substantially the same coverage. Therefore, PSA may have been entitled to exercise the option for a discovery period.

However, I cannot agree with defendants regarding their proposed remedy. In *Allen*, 710 F.Supp. at 1100, the court permitted the insureds to exercise their discovery option from the date of the court's opinion as a remedy for the failure to give notice. *Allen*'s solution mystifies me. Because PSA may have been entitled to exercise the discovery period, the proper remedy would be to place PSA in the position it would have been in had it opted for the discovery period following the expiration of the 1981 policy in June 1984.

Consequently, the proper analysis is to examine whether liability for the claims in RTC's suit would have been covered had the discovery period option been exercised following the expiration of the 1981 policy on June 30, 1984.

The discovery period would have expired in June 30, 1985, which is well before any "claim" had been made by the RTC or its predecessors. In fact, the alleged conduct serving as a basis for the suit by RTC was continuing at that point in time, and the ultimate negative impact on PSA of the five Florida investment projects had not yet been

substantially realized. Therefore, defendants were not harmed by the possible failure of ACC to notify PSA of the reduced nature of the subsequent policy and the failure to provide PSA with the opportunity to purchase the discovery period.

The other remedy sought by defendants is to reform the 1984 policy to exclude the Regulatory Exclusion Endorsement, that is, to provide coverage under the terms in the 1981 policy.

"[G]enerally, the law in Michigan places a duty upon an insured to read the policy and air any discrepancies in coverage within a reasonable time after issuance of the policy. However, this rule does not apply when a renewal policy is issued without calling the insured's attention to a reduction in coverage, as the insurer in those circumstances is bound by the greater coverage in the earlier policy." *J.C. Wyckoff & Assoc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1494 (6th Cir. 1991) (citing *Parmet Homes, Inc. v. Republic Ins. Co.*, 111 Mich.App. 140, 145, 314 N.W.2d 453 (1981)).

■ As noted above, at the time of the renewal, in July 1984, ACC agreed to "renew" the 1981 policy and did not indicate that a major coverage change would be included, such as the Regulatory Exclusion. When the actual policy was sent to PSA in August 1984, there is no evidence or allegation by ACC that it alerted PSA to the fact that the Regulatory Exclusion Endorsement was attached to the policy. Accordingly, under the equitable estoppel principles in Michigan law discussed above, I believe ACC may be bound by the greater terms of the 1981 policy until such time as PSA had actual notice of the reduction in coverage.

In its brief, ACC asserts that Franklin Smith and PSA's president, Robert Durren, reviewed the 1984 policy "upon its issuance." Although there is deposition testimony indicating that Mr. Smith became aware of the existence of the Regulatory Exclusion and discussed it with Mr. Durren sometime in 1984, I can find no evidence that this took place upon issuance. Therefore, there is a question of fact that exists concerning the interim period between issuance of the policy and the insured's knowledge of the exclusion that apparently occurred sometime prior to 1985.[8]

However, I find that, under the facts of this case, the period of ignorance of the Regulatory Exclusion caused no actual harm to PSA or the defendants. The evidence indicates that PSA had notice of the Regulatory Exclusion prior to 1985, more than two years before defendants allege that a claim was made or an occurrence was reported that could lead to a claim.

Paragraph 7(b) of the policy provides that the "policy may be cancelled by [PSA] at any time by written notice or by surrender of this policy.... If this policy shall be cancelled by [PSA], the Insurer shall retain the customary short rate portion of the premium.... Payment or tender of any unearned premium by the insurer ... shall be made as soon as practicable." Therefore, PSA could have cancelled the policy once it knew of the reduction in coverage, and it would have recovered at least a significant portion of its premiums.

Instead, though it knew of the reduction in coverage in 1984, PSA, through its agent and director Franklin Smith, sought in March 1985 to have ACC remove the Regulatory Exclusion upon payment of an additional premium. According to defendants' brief, and an attached handwritten memorandum, Mr. Callard, of ACC, apparently agreed, in April 1985, to do a cancellation-rewrite on a one-year period basis, but later, in May 1985, informed Mr. Smith that CNA and ACC would not remove the exclusion. Nevertheless, PSA did not cancel the policy at that

---

8. ACC notes that there was evidence of misrepresentation in *Parmet* and other cases supporting finding non-renewal and reforming the contract to be under the provisions of the previous contract. I note that defendants have produced some evidence from underwriters at ACC that the manner in which the so-called renewals were done was intended to not alert insureds about the reduction in coverage, in order to avoid having insureds seek to have the discovery period. Therefore, there was an element of fraud-like conduct involved in this case that may have warranted equitable remedies had PSA and defendants actually been harmed by the lack of notice of the reduction in coverage.

time. In fact, at the time of the expiration of the 1984 policy in June 1987, PSA chose to renew the ACC policy even though it still was to contain the Regulatory Exclusion.

I believe that once PSA had notice of the policy changes, it was incumbent upon it to air its concerns within a reasonable time. Further, its failure to cancel the policy, once it learned of the Regulatory Exclusion and was unsuccessful at obtaining its removal from the policy, constitutes an acceptance of the terms as they existed in the 1984 policy. This conclusion is supported by the fact that PSA actually renewed the 1984 policy in 1987, including the Regulatory Exclusion.

Whether the acceptance following notice is considered a "renewal" as of that time or merely assent to the terms of a new insurance contract is an unimportant label. The bottom line is that PSA could have sought alternate coverage and cancelled the ACC policy. It did not do so. It instead sought, unsuccessfully, to have the Regulatory Exclusion removed. It cannot now seek an equitable remedy from this Court to obtain what it was unable to bargain for: liability coverage without the Regulatory Exclusion.

Accordingly, I decline to reform the 1984 policy to be under the terms provided in the 1981 policy for the period following PSA's knowledge of the Regulatory Exclusion: 1985 onward. Therefore, the Regulatory Exclusion would have barred coverage of RTC's claim even if the claim had been found to have been first made during the period covered by the 1984 policy.

### Coverage of Legal Expenses

Defendant directors seek reimbursement of their legal expenses incurred in defending against the above-referenced action by the RTC. They assert that even if this Court determines that there is no coverage under the policy for the liability, if any, of the directors in the RTC suit, defense costs should have been paid up until that determination was made or at least through February 21, 1994, when ACC took the depositions upon which it based its motion for summary judgment.

ACC argues that its policy does not include a duty to defend, but rather includes

such defense costs as being among those costs covered by the policy should coverage be determined to exist. It notes that on February 5, 1992 and again on April 21, 1992, it informed defendant directors that its policies provided no coverage because no claim had been made during the policy periods. The April letter also noted that the Regulatory Exclusion barred coverage for the claims of the RTC with respect to the 1984 and 1987 policies. Finally, ACC argues that the cases cited by defendants in support of their motion did not address a situation, such as this, where coverage plainly does not exist.

Paragraph 1(d) of the policy provides as follows:

The term "Loss" shall mean any amount which the Directors and Officers are legally obligated to pay ... for a claim or claims made against the Directors and Officers for Wrongful Acts and shall include but not be limited to damages, judgments, settlements, *costs ... and defense of legal actions, claims or proceedings....* (emphasis added).

Paragraph 5, concerning costs, charges and expenses provides that:

(a) No costs, charges and expenses shall be incurred ... without the Insurer's consent which consent shall not be unreasonably withheld; however, in the event such consent is given, the Insurer shall pay ... such costs, settlements, charges and expenses.

\* \* \* \* \* \*

(c) The *Insurer may at its option and upon request, advance* on behalf of the Directors or Officers, or any of them, *expenses* which they have incurred in connection with claims made against them, prior to disposition of such claims, provided always that *in the event it is finally established the Insurer has no liability hereunder, such Directors and Officers agree to repay to the Insurer, upon demand, all monies advanced by virtue of this provision.* (emphasis added).

"[U]nder Michigan law an insurer with a duty to defend must defend an entire action if any portion of that action is even arguably

504

covered under its insurance policy." *Board of Trustees of Michigan State Univ. v. Continental Cas. Co.*, 730 F.Supp. 1408, 1413 (W.D.Mich.1990), *appeal dismissed*, 914 F.2d 255 (6th Cir.1990) (citing *Allstate Ins. Co. v. Demps*, 133 Mich.App. 168, 348 N.W.2d 720 (1984); *Insurance Co. of North America v. Forty Eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir.1980)).

However, "[d]uty to defend clauses and reimbursement clauses are two different things." *Id.* at 1414. " '[T]he fact that the insurance company has agreed to reimburse the defense costs of the insured does not create a duty to defend on the part of the insurance company.' " *Id.* (citing *Zaborac v. American Cas. Co.*, 663 F.Supp. 330, 333 (C.D.Ill.1987)).

In *Trustees*, as is also true here, " 'loss' whether incurred by way of judgment, settlement, or defense costs is charged against the policy limit without distinguishing between damages and legal fees." *Id.* (citing *Continental Cas. Co. v. Board of Educ. of Charles County*, 302 Md. 516, 489 A.2d 536 (1985)).

■ I agree with ACC that its policy clearly does not provide for a duty to defend. It merely includes defense costs as part of the "Losses" for which the policy will provide reimbursement.[9]

■ Even if I had concluded that the policy required ACC to pay defense costs as they became due,[10] I do not believe that the policies issued to PSA covered the defense of the claims made by RTC.

"[I]f an insurer has specifically and explicitly excluded coverage with unambiguous policy language, the express exclusions will free the insurer from any duty to defend." *Upjohn Co. v. Aetna Cas. & Sur. Co.*, 768 F.Supp. 1186, 1196 (W.D.1990) (citing *North River Ins. Co. v. Endicott*, 151 Mich.App. 707, 391 N.W.2d 454 (1986)). However, in making this determination, reference solely to "[t]he underlying facts ... [is] insufficient to release an insured from its duty to defend

even if they reveal a basis for excluding coverage." *Id.* (citing *Dochod v. Central Mut. Ins. Co.*, 81 Mich.App. 63, 264 N.W.2d 122 (1978); *Zurich Ins. Co. v. Rombough*, 384 Mich. 228, 180 N.W.2d 775 (1970)). "[W]here there is doubt as to whether or not a claim alleges liability under the policy, 'the doubt must be resolved in the insured's favor.' " *Id.* (quoting *Detroit Edison Co. v. Michigan Mut. Ins. Co.*, 102 Mich.App. 136, 142, 301 N.W.2d 832 (1980) (citing 14 *Couch on Insurance* 2d § 51:45, at 538)); *see also, Protective Nat'l Ins. Co. v. City of Woodhaven*, 438 Mich. 154, 159, 476 N.W.2d 374 (1991) (same).

As found above, RTC's claim is alleged to have been made during the 1984–87 policy period. The ACC policy in effect at that time included a Regulatory Exclusion Endorsement that unambiguously excluded claims made by depository agencies, including the RTC. Therefore, the policy did not arguably cover any part of the claims brought by the RTC. On April 21, 1992, ACC notified defendants of the applicability of the exclusion to their claim. Accordingly, even if the policy arguably included a duty to defend, ACC had no duty to defend PSA's Officers or Directors against the RTC suit under the policies issued to PSA.

**CONCLUSION**

For the foregoing reasons, ACC's motion for summary judgment is granted, and the motion by defendant directors to require ACC to pay for their defense is denied. The directors' and officers' liability policies issued by ACC to PSA covering the period from June 1981 through June 1988 do not provide coverage for the claims included in RTC's suit against the defendant directors, case no. 1:92–CV–174.

---

9. I also note that had ACC advanced money for defense costs, paragraph 5(c) arguably provides that the defendant directors would have had to pay back such funds upon this Court's finding that there is no coverage under the policy.

10. *See McCuen*, 946 F.2d at 1402.